OSCN Found Document:Question Submitted by: The Honorable Chris Kannady, Oklahoma House of Representatives, District 91

Previous Case

Top Of Index

This Point in Index

Citationize

Next Case

Print Only

Question Submitted by: The Honorable Chris Kannady, Oklahoma House of Representatives, District 912024 OK AG 10Decided: 07/12/2024Oklahoma Attorney General Opinions

Cite as: 2024 OK AG 10, __ __

¶0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:Does the allocation of municipal funds to a not-for-profit organization for the purpose of eviction prevention serve a valid public purpose within the applicable provisions of Oklahoma law?1
I.SUMMARY
¶1 Yes. The Oklahoma Constitution permits a municipality to determine, in its legislative capacity, that eviction prevention services provide a public purpose. Article X, sections 14 and 17, each require that all expenditures of public funds are for public purposes. The term "public purpose" is broadly interpreted with great deference to the Legislature and, by extension to the governing body of a municipality, which serves as its legislative body. State ex rel. Brown v. City of Warr Acres, 1997 OK 117, ¶ 17, 946 P.2d 1140, 1144. Oklahoma has at least three legislatively enacted programs to ensure individuals and families have access to housing, mitigate homelessness, and ameliorate the deleterious effects of these issues. The correlations between evictions, housing instability, and homelessness are known. And their impact on state and local economies is equally established. Conceivably, then, a municipality can, in its legislative function, determine that eviction prevention services assist with remedying housing instability and mitigating homelessness thereby lessening burdens on governments, including core police and court services, or otherwise promoting the public welfare.2
¶2 The conclusion in this opinion does not mean or suggest that a municipality should make such a determination. Instead, that decision-making authority is vested locally with those elected to govern a municipality. Any municipality determining that eviction prevention services are for public purposes and contracting with a third party to provide such services for the city must recognize, and not interfere with, the property owner's right to exclude others, including filing and completing an eviction. Finally, any contract between a municipality and a third party for eviction prevention services must establish and maintain adequate safeguards and governmental controls, as detailed below.

II.BACKGROUND
¶3 Individuals do not have a constitutional right to housing, any housing adequacy, or a right to occupy the landlord's property beyond the lease's terms.3 Instead, any assurance of housing or housing adequacy are matters that particularly rest within the domain of state policy. Alabama Ass'n of Realtors v. Dept. of Health & Human Servs., 594 U.S. 758, 765 (2021). Rental housing is no different. Id. And, a property owner, including any owner of rental housing, has a fundamental right to exclude others.4 Unsurprisingly, then, the Oklahoma Legislature established the Residential Landlord and Tenant Act, which authorizes landlords to exclude others from their property, including by eviction, and concurrently affords rights to tenants. 41 O.S.2021, Supp.2022 & Supp.2023, §§ 101--201.5 These property owner rights are settled. And they are often used.6 Illuminating the volume of cases, the parties involved, and the overarching goals and priorities, Tulsa County District Court Judge Doug Drummond recently stated:
The number of cases in our eviction court is staggering . . . . Reducing cases that go to court is a priority as is helping families who are legally evicted find another place to live. The Court's role is to provide a fair forum for both landlords and tenants, but the overall goal for our community is to reduce homelessness.
HOUSING SOLUTIONS, https://www.housingsolutionstulsa.org/tulsa-county-district-court-receives-grant-for-new-eviction-diversion-program/ (last visited July 9, 2024).
¶4 The Oklahoma Legislature has enacted at least three programs expressly addressing two issues raised by Judge Drummond: 1) families finding a place to live following an eviction, or housing instability, and 2) homelessness. See the Oklahoma Housing Authority Act, 63 O.S.2021, §§ 1051--1084; the Oklahoma Housing Stability Program, 74 O.S.Supp.2023, §§ 2903--2903.5; the Homeless Prevention Act, 74 O.S.2021, §§ 2900--2901.4. These programs intend to increase affordable housing, keep families housed, and recognize the costs and effects that housing instability and homelessness have on the State, citizens, and local communities. 63 O.S.2021, § 1053; 74 O.S.2021, § 2901.4. While the Legislature established these programs to keep individuals and families housed, no statutory programs expressly relating to eviction diversion assistance exist. However, correlations between the issues are known.7 And their impacts on each other, the parties involved, and state and local economies are equally understood.8 Considering this background, you submit your inquiry, which implicates article X, sections 14 and 17 of the Oklahoma Constitution. Accordingly, this office analyzes these constitutional provisions, case law, and Oklahoma statutes, which guide and answer your question.9
III.DISCUSSION
¶5 If a municipality determines that eviction prevention services provide a public purpose, the city may lawfully contract with a non-profit organization to provide such services for the benefit of the municipality. Provided, any determination and contract for such services must: 1) not substantively interfere with a property owner's right to exclude others from privately-owned property, including the right to file and successfully complete an eviction, and 2) establish and maintain adequate governmental controls and safeguards.
¶6 Article X, sections 14 and 17 contain a requirement that public funds are used for public purposes. OKLA. CONST. art. X, §§ 14(A), 17; State ex rel. Brown, 1997 OK 117, ¶ 1, 946 P.2d at 1143; Willow Wind, Inc. v. City of Midwest City, 1989 OK 171, ¶ 7, 790 P.2d 1067, 1070. The term "public purpose" is interpreted broadly and is not construed in a narrow and restricted sense. State ex rel. Brown, 1997 OK 117, ¶ 18, 946 P.2d at 1144. Indeed, "great deference" is given to a "legislative body's determination that a particular project . . . serve[s] a public purpose," and that determination will be reversed "only upon a clear showing that it was manifestly arbitrary, capricious, or unreasonable." Id.10 As early as 1938, the Oklahoma Supreme Court stated:
The meaning of "public purposes" for which governmental exaction of money may be had is not within a narrow and restricted sense. At any rate the courts cannot interfere to arrest legislative action where the line of distinction between that allowable and that which is not is faint and shadowy. In such instances the decision of the Legislature is accepted as final.

Helm v. Childers, 1938 OK 34, ¶ 5, 75 P.2d 398, 399 (emphasis added).
¶7 The Oklahoma Supreme Court expressly affirmed this rule in Way v. Grand Lake Association, 1981 OK 70, ¶ 38, 635 P.2d 1010, 1016--17.11
¶8 Critically, any established program or contract must also have governmental controls and safeguards to fully satisfy the public purpose requirement. Id.; see also Democratic Party of Okla. v. Estep, 1982 OK 106, ¶ 14 n.19, 652 P.2d 271, 276 n.19 (the legislation in Way required the "legislative policy to be followed and defined the category of expenditures for which reimbursement could be sought. All claims of the multicounty organizations to be benefitted by that act were required to be processed through the state budget office, on state-approved claim forms and pursuant to an approved budget."). Helm, 1938 OK 34, ¶ 4, 75 P.2d at 398; Orthopedic Hosp. of Okla. v. Oklahoma State Dep't of Health, 2005 OK CIV APP 43, ¶ 7, 118 P.3d 216, 221 (citing Veterans of Foreign Wars v. Childers, 1946 OK 211, ¶¶ 18, 24, 171 P.2d 618, 622, 624). Accordingly, if the program is for the public good, such as supporting the function of government or providing a public benefit, and the agency establishes proper controls, the use of funds withstands a 'public purpose' review.
¶9 This office previously concluded that public health, safety, and community welfare services constitute a public purpose. 2004 OK AG 15. Further, Oklahoma courts and this office have consistently determined that programs promoting economic growth and those benefitting the public's financial welfare satisfy the public purpose requirement. State ex rel. Brown, 1997 OK 117, ¶ 7, 946 P.2d at 1144; Way, 1981 OK 70, ¶ 38, 635 P.2d at 1016--17; 1986 OK AG 26; Application of S. Okla. Dev. Tr., 1970 OK 118, ¶ 16, 470 P.2d 572, 574; Sublett v. City of Tulsa, 1965 OK 78, ¶ 37, 405 P.2d 185, 196--97.12 Furthermore, housing programs that lessen the burdens of government also serve a public purpose.13 1982 OK AG 34, ¶ 7 (citing Shotts v. Hugh, 1976 OK 73, ¶ 16, 551 P.2d 252, 255).
¶10 Here, Oklahoma has multiple public purpose programs that relate to housing individuals and families and, in turn ameliorating housing instability and mitigating homelessness. In one, the Housing Authority Act, the Legislature aims to ensure low-income individuals and families have affordable housing and can maintain a whole living environment. 63 O.S.2021, § 1053(e); Boardman v. Oklahoma City Hous. Auth., 1968 OK 132, ¶ 2, 445 P.2d 412, 414. In another, the Oklahoma Housing Stability Program created in 2023, the Legislature seeks to increase affordable housing in urban and rural areas of the state. 74 O.S.Supp.2023, §§ 2903--2903.5. Finally, in a separate program, the Legislature authorizes agencies to assist eligible homeless individuals and families in participating in the private housing market and paying the rent the private sector charges for housing. 74 O.S.2021, § 2900.2.14 Together, these programs protect the public from these issues' deleterious effects on the state. 63 O.S.2021, § 1053(b); 74 O.S.2021, § 2901.1. As detailed above, housing instability, homelessness, and evictions are intertwined issues.15
¶11 Accordingly, a municipality may, in its legislative function, determine that eviction prevention provides a public benefit, such as assisting with housing instability, mitigating homelessness and lessening the burdens on government services, or otherwise promoting the community welfare.16 As such, a municipality making this determination may lawfully contract with a non-profit to provide eviction prevention services, such as legal services, and satisfy the "public purpose" requirement in the Oklahoma Constitution.17 Provided, any such contract must contain adequate governmental controls and safeguards.18
¶12 It is, therefore, the official Opinion of the Attorney General that:

A municipality may determine that eviction prevention services provide a public purpose and, therefore, the city may lawfully contract with a non-profit organization to provide such services for the benefit of the municipality. Provided, any determination and contract for such services must: 1) not substantively interfere with a property owner's right to exclude others from privately-owned property, including the right to file and successfully complete an eviction, and 2) establish and maintain adequate governmental controls and safeguards.19

 

GENTNER DRUMMONDATTORNEY GENERAL OF OKLAHOMA
BRADLEY CLARKDEPUTY GENERAL COUNSEL

FOOTNOTES
1 Based on information provided to this office, "eviction prevention" does not include monetary payment to an individual as a part of rental assistance. Instead, your inquiry concerns eviction diversion services providing legal aid, mediation, case management, data, and other information to those facing eviction and landlords. National Center for State Courts, https://www.ncsc.org/consulting-and-research/areas-of-expertise/access-to-justice/eviction-resources/eviction-diversion-planning (last visited July 9, 2024). For the avoidance of doubt, an example within your inquiry is a municipality contracting with a not-for-profit, such as Legal Aid Services of Oklahoma, a non-profit, 501(c)(3) for civil legal services, such as legal counsel, to individuals and families facing or at risk of facing eviction and a pathway for parties to resolve their issues quickly and affordably.
2 Equally, to mitigate homelessness and its impacts, a municipality may enact an ordinance prohibiting sleeping or camping on public property, including fines and other consequences for violations. City of Grants Pass, Oregon v. Johnson, No. 23-175, 2024 WL 3208072, at *19 (U.S. June 28, 2024), ("Homelessness is complex. Its causes are many. So may be the public policy responses required to address it."); see also S.B. 1854, 59th Leg., 2024 2d Reg. Sess. (Okla. 2024) (prohibiting use of state-owned lands to establish an unauthorized camp, including tent, shelter, or bedding for overnight use on property not designated as a campsite).
3 The United States Constitution does not "guarantee . . . access to dwellings of a particular quality," Lindsey v. Normet, 405 U.S. 56, 74 (1972), and states have "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular." Pennell v. City of San Jose, 485 U.S. 1, 12 n.6.
4 Cedar Point Nursery v. Hassid, 594 U.S. 139, 140 (2021) (right to exclude is not an empty formality that can be modified at the government's pleasure); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435, (1982) (right to exclude is one of the most treasured rights of property ownership).
5 Recently, the Legislature established additional protections for private property owners, explicitly bolstering the right to exclude and remove others unlawfully occupying real property. 21 O.S.Supp.2024, §§ 1354--56 (generally providing property owners with the right to request a sheriff immediately remove a person unlawfully occupying real property but excluding from its removal provisions persons who are or were former tenants under a written or oral rental agreement).
6 In 2016, the Eviction Lab at Princeton University ranked Tulsa and Oklahoma City as the eleventh and twentieth highest evicting cities in the United States, despite ranking forty-eighth and twenty-seventh in population ranking, respectively. Eviction Lab, https://evictionlab.org/rankings/#/evictions?r=United%20 States&a=0&d=evictionRate (last visited July 9, 2024); 2016 Census. Additionally, in 2016, landlord-tenant cases represented nearly twenty percent of all filings in courts across the United States. Trends in State Courts, National Center for State Courts 90 (2016), https://www.ncsc.org/__data/assets/pdf_file/0027/25578/meeting-the-challenges.pdf.
7 Homelessness Stateside Overview, Oklahoma Housing Needs 7, 32 (2015) https://oklahomahousingneeds.org/wp-content/uploads/2016/03/Homelessness-Statewide-Overview.pdf (2015 Oklahoma Department of Commerce and the Oklahoma Housing Finance Agency report providing that the absence of affordable housing is the largest cause of homelessness in the state, that Oklahoma families living in subsidized (affordable) housing are most at risk for homelessness because a missed payment can easily lead to eviction and homelessness, and that the majority of the unsheltered homeless population in Oklahoma City reside in emergency shelters after falling on hard times, such as "have been lately evicted, lost their job, or have significant medical expenses."). See also Strategies to Address Homelessness in Oklahoma City, City of Oklahoma City 17, 25 (2021) https://www.okc.gov/departments/planning/programs/homelessness/strategies-to-address-homelessness-in-oklahoma -city (affordable housing is the greatest need for people experiencing homelessness in Oklahoma City, and that evictions, which "displace many individuals and families from their home to the street or into homelessness."); 74 O.S.2021, §2901.4.
8 Indeed, these direct and downstream costs are significant. One unhoused individual is estimated to cost taxpayers $96 per day. City of Oklahoma City, https://www.okc.gov/Home/Components/News/News/4736/18 (last visited July 9, 2024). Extrapolating these figures, one day of homelessness for the more than 8,000 families evicted in Oklahoma City in 2023 costs taxpayers more than $2 million. Id. These costs include jail, transportation, shelters, emergency rooms, mental health services, hospitals, and police services, particularly among 28% of Oklahoma City's homeless population who are chronically homeless. Strategies to Address Homelessness in Oklahoma City, City of Oklahoma City 11 (2021), https://www.okc.gov/departments/planning/programs/homelessness/strategies-to-address-homelessness-in-oklahoma-city. Effects on communities are also present with increases in crime. Daniel Semenza, Richard Stansfield, Jessica M. Grosholz & Nathan W. Link, Eviction and Crime: A Neighborhood Analysis in Philadelphia, 68 Crime & Delinquency 707 (2022) (finding evictions are directly associated with an uptick in homicide, burglary, and robberies); see also Stefano Falcone, Do Evictions Increase Crime? Evidence from Nuisance Ordinances in Ohio, Barcelona School of Economics (Sept. 2022) https://www.iae.csic.es/investigatorsMaterial/a221912085344sp37207.pdf (finding every ten percent increase in evictions led to a five-and-one-half percent increase in burglaries and an eight-and-one-half percent increase in the number of vehicle thefts). In Norman, Oklahoma, available data demonstrates that there were approximately 100 more arrests at homeless shelters between 2021 and 2022, with drug violations, public intoxication, assault, and theft as the most common causes. Andrea Hancock, Homelessness and crime by the numbers: What we know, The Norman Transcript, https://www.normantranscript.com/news/courts_crime_police/homelessness-and-crime-by-the-numbers-what-we-know/article_ed7c3144-96e9-11ee-bccb-378aa6b2fcd6.html (Dec. 10, 2023).
9 Historically, an analysis of the "public purpose" requirement is sewn with Oklahoma's constitutional prohibitions on gifts of funds to a private organization without adequate consideration. See Okla. Const. art. X, §§ 15 (applicable to the State) and 17 (applicable to a municipality). However, because this office understands your question relates to a non-profit organization providing services under a contract with a municipality, this situation does not involve an unlawful gift. Stated otherwise, within the context of your inquiry, the municipality receives services and benefits in exchange for monetary payment to the non-profit. Childs. Home & Welfare Ass'n v. Childers, 1946 OK 180, ¶ 5, 171 P.2d 613, 614 (a contract entered by the State does not constitute a gift when the State receives property or services in exchange for monetary payment.). Accordingly, an analysis of the constitutional prohibition on gifts is unnecessary.
10 The Oklahoma Supreme Court has previously described municipal powers and functions as follows:
The City Council is the legislative body of a city. As such, it is its function to determine what expenditures are designed to promote the public good and welfare of the city and its inhabitants. It has no limitations as to expenditures, "save and except those which are expressly placed on its exercise by the Constitution of the State."

State ex rel. Brown, 1997 OK 117, ¶ 17, 946 P.2d at 1144 (quoting, in part, Dixon v. Shaw, 1927 OK 24, ¶ 5, 253 P.500, 501). Municipalities have statutory power to "[m]ake all contracts and do all other acts in relation to the property and affairs of the municipality, necessary to the good government of the municipality . . . ." 11 O.S.2021, § 22-101(4).
11 See also Oklahoma City News Broad. Ass'n v. Nigh, 1984 OK 31, ¶ 13, 683 P.2d 72, 76 ("We hold that whether such appropriation is for a 'public purpose' is for determination by the Legislature unless it is clearly shown to be for a purpose expressed by the Legislature in violation of the Constitution." (Emphasis added.))
12 See also 1986 OK AG 71 and 2008 OK AG 10 (determining that contracting with a private organization for inmates' health, educational or vocational training satisfies the 'public purpose' requirement); But see 1980 OK AG 44; 1986 OK AG 26 (allocating funds to a private organization solely to benefit various private activities or making improvements that only benefit private property or persons are not authorized public purposes).
13 The benefits do not have to be spread equally across the entire community. Instead, the Oklahoma Supreme Court has found that "[a] use may be public although it is of benefit primarily to the inhabitants of a small and restricted locality." Way, 1981 OK 70, ¶ 32, 635 P.2d at 1016; Willow Wind, Inc., 1989 OK 171, 790 P.2d 1067.
14 2017 OK AG 4, ¶ 14 (the Homeless Prevent Act is part of the "State's obligation to mitigate homelessness."). Outside the context of your questions, but to illustrate the scope of this authority, the duty to mitigate homelessness extends to providing public resources to governmental and non-governmental entities, including through monetary payments for rental assistance. 74 O.S.2021, § 2900.1.
15 See supra notes 6--7. Established connections between housing instability, homelessness, and eviction exist elsewhere. In New York, one federal court candidly determined that "if the Court does not enjoin the pending eviction proceeding, the threat that the Plaintiffs will be evicted and rendered homeless is very high." Sinisgallo v. Town of Islip Hous. Auth., 865 F.Supp.2d 307, 343 (E.D.N.Y. 2012); see also Dawson v. Higgins, 197 A.D.2d 127, 138 (citing In re McMurray v. New York State Div. of Hous. & Cmty. Renewal, 135 A.D.2d 235, 238) (protections afforded to tenants is a "tacit recognition of the devastating impact that evictions can have on such tenants and their communities . . . . After a long residency a tenant takes root in the community and his or her forced removal from familiar surroundings causes, at the very least, severe disruption. It can also contribute to the problem of homelessness."). Furthermore, federal regulations define "homeless" to include facing immediate eviction and inability to identify a subsequent residence). (24 CFR § 291.405; see also 24 CFR § 583.301 (defining "homeless" to include an individual who will "imminently lose their housing.")
16 Across the country, many municipalities have established eviction prevention programs in their efforts to address homelessness and housing instability. For example, the City of Durham, North Carolina, launched such a program in 2017 and has seen individuals and families avoid eviction 80% of the time, and two-thirds of tenants remain in their homes. https://evictioninnovation.org/2020/01/28/diversion-durham/. Other examples include the Kalamazoo, Michigan; Cleveland, Ohio; Kansas City, Missouri; and Louisville, Kentucky. Kalamazoo, MI, HPRP-Funded Prevention Program, Huduser.gov (2015) https://www.huduser.gov/portal/sites/default/files/pdf/HPRP-Case-Study-Kalamazoo-MI.pdf (finding that in 2013, 360 evictions were prevented, including 719 adults and 363 children); Kansas City program helping residents stay housed, Kansas City (Sept. 21, 2022 12:36 PM), https://www.kcmo.gov/home/components/news/news/1950/625; StopMyEviction, https://www.stopmyeviction.org/ (last visited July 9, 2024).
17 Again, this is assuredly not to suggest any guarantee or adequacy of housing. Neither is a constitutional right. See supra Introduction. Furthermore, this determination does not interfere with a property owner's right to engage in lawful means to exclude individuals from property. That right is fundamental, constitutionally, and legislatively backed, and undisturbed. Alabama Ass'n of Realtors, 594 U.S. at 765 ("preventing [landlords] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership--the right to exclude"). Nothing herein prevents the landlord from invoking the eviction process or executing it to its finish.
18 For example, sufficient controls to guard the administration and allocation of funds include, but are not limited to, the following: define eligible services, set eligibility criteria, require submission of claims on governmental forms and records, limit expenditures to those in an approved budget, and mandates performance measures. Way, 1981 OK 70, ¶¶ 9--10, 30, 40, 635 P.2d at 1013, 1015, 1018; see also Democratic Party of Okla., 1982 OK 106, ¶ 14 n.19, 652 P.2d at 276 n.19; see also State of Oklahoma Single Audit Fiscal Year 2022 (finding millions of dollars in questioned and unallowable costs, including more than seven million dollars associated with rental assistance payments under the State's administration of a federal program). https://www.sai.ok.gov/Search%20Reports/database/2022OKStateSingleAudit.pdf. In no instance, however, can a municipality allocate funds to a third party for eviction prevention services and do so free of the municipality's control or management. Veterans of Foreign Wars, 1946 OK 211, 171 P.2d 618.
19 Eviction prevention services are potentially eligible for funding as they may serve a "public purpose," as explained in this opinion. However, this office cannot and does not pass on whether a specific eviction prevention service, in fact, serves a public purpose. Questions of fact are beyond the scope of an Attorney General Opinion. See 74 O.S.Supp.2022, § 18b(A)(5).

Citationizer© Summary of Documents Citing This Document

Cite
Name
Level

None Found.

Citationizer: Table of Authority

Cite
Name
Level

Oklahoma Attorney General's Opinions

 
Cite
Name
Level

 
2004 OK AG 15,
Question Submitted by: The Honorable James E. Covey, State Representative, District 57
Cited

 
1986 OK AG 26,
Question Submitted by: The Honorable Robert V. Cullison, Oklahoma State Senate, The Honorable James E. Hamilton, Oklahoma House of Representatives
Cited

Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2005 OK CIV APP 43, 118 P.3d 216,
ORTHOPEDIC HOSPITAL OF OKLA. v. THE OKLA. STATE DEPT. OF HEALTH
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1989 OK 171, 790 P.2d 1067, 61 OBJ 22,
Willow Wind, Inc. v. City of Midwest City
Discussed at Length

 
1938 OK 34, 75 P.2d 398, 181 Okla. 535,
HELM v. CHILDERS
Discussed at Length

 
1946 OK 180, 171 P.2d 613, 197 Okla. 243,
CHILDRENS HOME & WELFARE ASS'N v. CHILDERS
Discussed

 
1946 OK 211, 171 P.2d 618, 197 Okla. 331,
VFW v. CHILDERS
Discussed at Length

 
1965 OK 78, 405 P.2d 185,
SUBLETT v. CITY OF TULSA
Discussed

 
1968 OK 132, 445 P.2d 412,
BOARDMAN v. OKLAHOMA CITY HOUSING AUTHORITY
Discussed

 
1970 OK 118, 470 P.2d 572,
APPLICATION OF SOUTHERN OKLAHOMA DEVELOP. TRUST
Discussed

 
1976 OK 73, 551 P.2d 252,
SHOTTS v. HUGH
Discussed

 
1927 OK 24, 253 P. 500, 122 Okla. 211,
DIXON v. SHAW
Cited

 
1981 OK 70, 635 P.2d 1010,
Way v. Grand Lake Ass'n, Inc.
Discussed at Length

 
1997 OK 117, 946 P.2d 1140, 68 OBJ 3092,
STATE ex rel. BROWN v. CITY OF WARR ACRES
Discussed at Length

 
1982 OK 106, 652 P.2d 271,
Democratic Party of Oklahoma v. Estep
Discussed at Length

 
1984 OK 31, 683 P.2d 72, 55 OBJ 1128,
Oklahoma City News Broadcasters Ass'n, Inc. v. Nigh
Discussed

oscn

EMAIL: webmaster@oscn.net
Oklahoma Judicial Center
2100 N Lincoln Blvd.
Oklahoma City, OK 73105

courts

Supreme Court of Oklahoma
Court of Criminal Appeals
Court of Civil Appeals
District Courts

decisions

New Decisions
Supreme Court of Oklahoma
Court of Criminal Appeals
Court of Civil Appeals

programs

The Sovereignty Symposium

Alternative Dispute Resolution
Early Settlement Mediation
Children's Court Improvement Program (CIP)
Judicial Nominating Commission
Certified Courtroom Interpreters
Certified Shorthand Reporters
Accessibility ADA

Contact Us
Careers
Accessibility ADA